UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHERMAN GRAHAM,

                              Plaintiff,                                **REPORT AND**
                                                                        **RECOMMENDATION**

        -against-                                                       CV-05-5428 (CBA) (JMA)


CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CORRECTIONS,

                              Defendants.
------------------------------------------------------------------X

A P P E A R A N C E S :

Karl J. Stoecker
Law Offices of Karl J. Stoecker
22 Jericho Turnpike
Suite 100 East
Mineola, NY 11501
        *Attorney for Plaintiff*

Michael A. Cardozo
Corporation Counsel of the City of New York
100 Church Street
Room 2-184
New York, NY 10007-2601
        *By: Ivan A. Mendez, Jr.*
        *Assistant Corporation Counsel*
        *Attorney for Defendants*

**AZRACK**, **United States Magistrate Judge:**

        Plaintiff Sherman Graham brings this action against his employer, the New York City

Department of Corrections, pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the New York State Human Rights

Law, N.Y. Exec. Law § 290 et seq.; the New York City Administrative Code, N.Y.C. Admin.

Code § 8-107(19); and New York Civil Service Law § 75-b.  Specifically, Graham claims that

defendants discriminated against him because of his race and national origin, as well as unlawfully retaliated against him for his participation in protected activity. By motion dated June 13, 2008, defendants moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. By Order dated June 18, 2008, the Honorable Carol B. Amon referred defendants' motion to me for a report and recommendation. Considering the evidence in the light most favorable to plaintiff, I find that there are genuine issues of material fact requiring a trial on plaintiff's claims of race discrimination. Therefore, I respectfully recommend that defendants' motion be granted in part and denied in part. Specifically, I recommend that summary judgment be granted as to plaintiff's retaliation, national origin and New York Civil Service Law claims, and that defendants' motion be otherwise denied.

## I. BACKGROUND

The following facts are undisputed unless otherwise indicated. Sherman Graham ("Graham" or "Plaintiff") is an African-American male who has been employed by defendant New York City Department of Corrections ("DOC") since 1991. (Compl. ¶ 4; Defs.' 56.1 Stmt. ¶ 1.) In 2001, Graham was promoted from the rank of Corrections Officer to the rank of Captain and was assigned to DOC's Adolescent Reception and Detention Facility ("ARDC") on Riker's Island. (Compl. ¶¶ 4-7; Defs.' 56.1 Stmt. ¶ 2.)

At ARDC, most Officers and Captains are assigned to a rotating schedule known as "the wheel," however, DOC employees may apply for steady work assignments. (Defs.' 56.1 Stmt. ¶¶ 5-6.) Pursuant to its regulations, DOC considers several criteria before an employee is awarded a steady assignment. (Id. ¶ 7.) These include (1) seniority; (2) work performance; (3) attendance; (4) special skills; and (5) prior or current discipline problems. (Id.) Employees with pending disciplinary charges are not usually awarded steady assignments. (Id. ¶ 8.) In

November 2002, Graham was appointed Security Captain—a steady assignment at ARDC. (Id. ¶ 9.) When Graham was promoted, James Bearing was the Warden in charge at ARDC, Robert Shaw was the Deputy Warden ("DW") of security and Brenda Emery was Assistant DW and Graham's direct supervisor. (Graham Dep. I at 25.)[1] In April 2004, Peter Curcio became ARDC's Warden. (Curcio Decl. ¶ 2.) The next month, DW Rafael Olivo ("DW Olivo") was assigned to ARDC and became Graham's immediate supervisor. (Defs.' Reply 56.1 Stmt. ¶ 4.)

In the acrimonious months following DW Olivo's assignment to ARDC, several incidents occurred at the facility concerning Graham's performance as Security Captain. During July 2004, DW Olivo claimed that Graham improperly had the locks changed on a security office shared by Graham and another ARDC Captain. (Defs.' 56.1 Stmt. ¶¶ 11-13.) Graham denied this and maintained that he did not have the locks changed. (Pl.'s 56.1 Stmt. ¶ 11.) DW Olivo also claimed that Graham ignored orders that he be present when searches of inmates were conducted using a body orifice scanner ("BOSS") chair. (Defs.' 56.1 Stmt. ¶¶ 14-18.) Graham maintained that these searches were routine and that the presence of other Security Captains was not required each time a BOSS chair was used. (Pl.'s 56.1 Stmt. II ¶¶ 23-34.)[2]

The following month, DW Olivo claimed that Graham failed to comply with a directive from Warden Curcio to procure inmate jumpsuits. (Defs.' 56.1 Stmt. ¶¶ 19-20.) In response, Graham stated that he attempted numerous times to obtain the jumpsuits but that they were out of stock. (Pl.'s 56.1 Stmt. ¶¶ 20-21.) Later that month, DW Jose Matos claimed that a report prepared by Graham concerning the air conditioners at ARDC was inaccurate. (Defs.' 56.1 Stmt.

---

[1] Plaintiff was deposed twice in this case; the deposition held on October 25, 2006 is referred to as "Graham Dep. I" and the deposition held on February 21, 2007 is referred to as "Graham Dep. II."

[2] Plaintiff's Rule 56.1 Statement is divided into two sections, the first portion responds to Defendants' Rule 56.1 Statement in corresponding numbered paragraphs, while the second portion is titled "Additional Material Facts As To Which Plaintiff Contends There Are Genuine Issues To Be Tried." For clarity, the Court refers those portions of plaintiff's statement which respond directly to defendants' statement as "Pl.'s 56.1 Stmt." and refers to those portions of plaintiff's statement purporting to offer additional material as "Pl.'s 56.1 Stmt. II."

¶¶ 22-23.)  DW Olivo also claimed that Graham failed to comply with "specific instruction[s]" to obtain new forms and clips needed to prepare inmate identification cards.  (Defs.' 56.1 Stmt. ¶¶ 24-26.)  Graham contended that no instructions were given and that these directives were designed to harass him with meritless misconduct charges.  (Pl.'s 56.1 Stmt. ¶¶ 26-27.) Additionally, Graham was officially disciplined for misplacing his DOC shield and identification card.  (Defs.' 56.1 Stmt. ¶ 32.)

In September 2004, DW Olivo claimed that Graham improperly interviewed inmates in his office while the inmates were un-handcuffed and attired in civilian clothing.  (Defs.' 56.1 Stmt. ¶¶ 28-31.)  Graham responded that inmates were routinely interviewed in this manner so as to gain their trust and confidence.  (Pl.'s 56.1 Stmt. II ¶¶ 40-45.)  Graham further stated that a Caucasian ARDC Captain was also present during the course of these interviews but was not disciplined for the alleged infractions of security protocol.  (Id. ¶ 49.)  For this incident, DW Olivo levied formal charges against Graham, which were ultimately dismissed.  (Pl.'s 56.1 Stmt. II ¶ 54.)  In yet another incident, DW Robert Kripps claimed that Graham failed to comply with an order to review ARDC medical logs for suspicious injuries and, as a result, a serious inmate injury went unreported for two days.  (Defs.' 56.1 Stmt. ¶¶ 34-36.)  Graham denied this and maintained that he had reviewed the medical logs.  (Pl.'s 56.1 Stmt. ¶ 34.)

DW Olivo next claimed that Graham failed to ensure that transfrisker devices used to search inmates for contraband were working properly.  (Defs.' 56.1 Stmt. ¶¶ 37-39.)  Graham, by contrast, stated that officers working under his supervision did not notify him that the devices were defective.  (Graham Dep. II at 13.)  Finally, on September 9, 2004, DW Olivo suggested to Graham that he seek a different assignment at ARDC, and offered him the position of Food Service Captain, a steady post held at that time by Matthew Boyd, a Caucasian ARDC Captain.

(Pl.'s 56.1 Stmt. II ¶¶ 6, 9; Defs.' Reply 56.1 Stmt. ¶¶ 6, 9.) Graham did not accept this offer, and instead applied for an assignment as Learning Center Captain; which was ultimately awarded to a Captain with less seniority than Graham. (Pl.'s 56.1 Stmt. II ¶¶ 10-12; Defs.' 56.1 Stmt. ¶ 12.)

On September 28, 2004, Graham filed a charge of discrimination with DOC's Office of Equal Employment Opportunity ("OEEO"). (Defs.' 56.1 Stmt. ¶ 47; Pl.'s 56.1 Stmt. ¶ 47.) According to Graham, he was shortly thereafter removed as Security Captain and reassigned to an undesirable rotating schedule on the wheel. (Compl. ¶ 13; Pl.'s 56.1 Stmt. ¶ 47; Graham Aff. ¶ 17.) Subsequently, Captain Boyd was appointed Security Captain. (Pl.'s 56.1 Stmt. II ¶ 14; Defs.' Reply 56.1 Stmt. ¶ 6.) However, defendants stated that the decision to transfer Graham was made on September 21, 2004. (Defs.' Reply 56.1 Stmt. ¶ 78.) Defendants further stated that Graham's former post was initially offered to two African-American candidates, but because both declined the appointment, the position was awarded to Captain Boyd; who was the last remaining candidate. (Defs.' Reply 56.1 Stmt. ¶ 6.) In response, Graham contended that African-American candidates were "passed over" in favor of Captain Boyd. (Graham Aff. ¶ 16.) Several months later, Graham was transferred to Captain Boyd's former Food Service Captain post. (Defs.' 56.1 Stmt. ¶ 43.) Graham stated that this assignment, despite being a steady post at ARDC, involved undesirable shifts and that he was the subject of ridicule among ARDC staff concerning a tartar sauce shortage. (Pl.'s 56.1 Stmt. ¶¶ 87-89.)

After serving as Food Service Captain, Graham was transferred to the position of Investigation Captain, where he remained assigned until October 2006, when, following a "use of force" incident, he was transferred to his current post in an ARDC housing unit known as "the Sprungs." (Defs.' 56.1 Stmt. ¶¶ 44-46; Pl.'s 56.1 Stmt. ¶ 45; Graham Dep. II at 38.) Finally,

subsequent to the filing of the instant complaint, Graham applied for, but was not awarded, the following positions: Control Room Captain; Personnel Captain; and Administrative Services Captain.  (Defs.' 56.1 Stmt. ¶¶ 54-56.)

At bottom, DW Olivo maintained that Graham was an unmotivated and insubordinate employee unfit for Security Captain duties.  (<u>See generally</u>, Olivo Dep. at 164-165.)  By contrast, Graham stated that he was improperly burdened with frivolous assignments as a ruse calculated to support his eventual removal as Security Captain and facilitate the transfer of a Caucasian Captain into his post.  (<u>See generally</u>, Graham Dep. I at 52-53.)

 On February 16, 2005, Graham filed a charge of discrimination with the New York State Division of Human Rights, and was issued a Right to Sue Letter on August 19, 2005.  (Comp. ¶ 20.)  On November 17, 2005, Graham brought this action against defendants, claiming that he is a victim of discrimination on the basis of his race and national origin and that defendants retaliated against him for filing various charges of discrimination.  (<u>See</u> Dkt. No. 1.)  Defendants, however, contend that summary judgment is appropriate because there are no genuine issues of material fact in dispute.

## II.  DISCUSSION

### A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986).  The burden is upon the moving party to demonstrate that "no genuine issue of material fact exists,"

Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted), but "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003) (citation omitted). The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist. Anderson, 477 U.S. at 249 (citation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

However, "[t]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. at 248-49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). In deciding a motion for summary judgment, the court's function is not to weigh the evidence or resolve issues of fact, but only to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250; see also Lucente v. IBM, 310 F.3d 243, 254 (2d Cir. 2002).

The Second Circuit has instructed that district courts must be cautious when considering summary judgment in favor of an employer in an employment discrimination case, because direct evidence of discriminatory intent is rare and often must be inferred from circumstantial evidence in affidavits and depositions. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, the court has also explained that "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citations omitted).

B. Abandoned Claims

Defendants move for summary judgment on Graham's national origin claims. Specifically, defendants argue that the Court lacks subject matter jurisdiction over these claims because they were not alleged in plaintiff's EEOC complaint. (See Defs.' Mem. at 2-3.) Defendants also seek summary judgment on Graham's retaliation claim brought pursuant to New York Civil Service Law § 75-b and argue that this provision may only be invoked by

employees who—unlike Graham—are unprotected by collective bargaining agreements with the City of New York. (See Defs.' Mem. at 28.) Graham has failed to respond to these arguments. Accordingly, the Court considers these claims abandoned and recommends that defendants' motion for summary judgment be granted. See Halstead v. N.Y. City Transit Auth., CV-99-3450, 2002 WL 34438897, at *4 (E.D.N.Y. Dec. 30, 2002) (Amon, J.) (citations omitted).

C. Liability Under Title VII[3]

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000-e2(a)(1). Plaintiff's claims of discrimination and retaliation are analyzed using the familiar burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this analysis, plaintiff must first prove a prima facie case of discrimination. Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Quarantino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995). The burden of establishing a prima facie case is not onerous. Burdine, 450 U.S. at 253-254. In considering whether plaintiff has established his prima facie case, the Court "presume[s] the acts, if not otherwise explained, are more likely than

---

[3] While the Court's analysis focuses on Graham's claims brought pursuant to Title VII, the same substantive standards apply to Graham's claims arising under § 1981. See Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 225-226 (2d Cir. 2004). Graham also seeks relief for alleged discrimination and retaliation under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. and the New York City Administrative Code, N.Y.C. Admin. Code § 8-107(19). The standards for liability under these provisions are identical to those under the equivalent federal anti-discrimination laws. See Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) citing Forrest v. Jewish Guild for the Blind, 765 N.Y.S.2d 326, 332-33 (N.Y. 2003) ("[T]he standard for recovery under section 296 of the Executive Law is in accord with the federal standards under [Title VII], and the human rights provision of New York City's Administrative Code mirror the provisions of the Executive Law.") Therefore, in determining whether defendants are entitled to summary judgment under the above provisions of New York law, I will consider whether defendants are entitled to summary judgment under the federal anti-discrimination laws.

not based on the consideration of impermissible factors." Id. at 254, citing Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978); see also Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

Should the plaintiff establish a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its employment action. McDonnell Douglas, 411 at 802; Scaria, 117 F.3d at 654. "This burden is one of production, not persuasion; it can 'involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000), quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). The burden must be supported by admissible evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. St. Mary's Honor Ctr., 509 U.S. at 507. Like plaintiff's initial burden to establish a prima facie case, it is not a demanding one. Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999)

If the employer carries this burden, the burden shifts back to plaintiff to demonstrate by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253. To do so, a plaintiff must convince the trier of fact that defendants' proffered reasons are false. McCarthy v. N.Y. Technical Coll. of City Univ. of N.Y., 202 F.3d 161, 166 (2d Cir. 2000). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr., 509 U.S. at 515. The Court must examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) quoting Reeves, 530 U.S. at 142. If the plaintiff fails to show that there is evidence

that would permit a rational fact-finder to infer that the employer's rationale is pretext, summary

judgment is appropriate. Smith v. American Express Co., 852 F.2d 151, 154-55 (2d Cir. 1988).

1. Prima Facie Discrimination

As noted above, plaintiff's burden in demonstrating prima facie evidence of

discrimination is de minimis. Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 467 (2d Cir.

2001). The plaintiff can satisfy his burden of establishing a prima facie case by showing that (1)

he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered

an adverse employment action; and (4) the circumstances surrounding the employer's action give

rise to an inference of discrimination. See Reeves, 530 U.S. at 142.

In this case, Graham asserts that DW Olivo and other ARDC superiors disparately

"subject[ed] [his] work to intense scrutiny and issued a barrage of special assignments consisting

of time consuming make-work and humiliating, menial and tedious tasks of a kind typically

assigned to clerical staff or new members of service." (Graham Aff. ¶ 9.) In support, Graham

points to the specific instances noted above in which he was, inter alia, verbally reprimanded for

failing to search inmates with the BOSS chair; failing to remedy malfunctioning transfrisker

devices; failing to properly survey ARDC magnetometers; failing to obtain prisoner jump-suits;

failing to obtain inmate identification cards; and formally disciplined for breaching security

protocol when interviewing inmates. (See id. ¶¶ 10-13; Compl. ¶¶ 10-11; see generally Graham

Dep. II at 10-28.) Graham further states that non-African-American employees were not

disciplined for similar infractions of DOC procedure. (Compl. ¶ 8.) Specifically, Graham claims

that John McGarrigle, a Caucasian DOC Captain present with Graham during the inmate

interviews allegedly conducted in contravention of DOC security regulations was not subjected

to any discipline. (Graham Dep. I at 53-54; Graham Dep. II at 43.) As a result of these incidents

Graham believed that DW Olivo discriminated against him based on his race. (Graham Dep. II at 44-45.)

a) <u>Disparate Treatment Claim</u>

It is undisputed that Graham satisfies the first prong of the <u>McDonnell Douglas</u> test. Defendants also concede for purposes of this summary judgment motion that Graham's removal as Security Captain and subsequent transfers to the Food Service Captain post and his current Housing Supervisor post constituted adverse employment actions. (<u>See</u> Defs.' Reply Mem. at 8 n.4.) However, the parties dispute whether Graham was performing his duties satisfactorily or whether he can demonstrate that the circumstances surrounding his removal as Security Captain and subsequent reassignments give rise to an inference of discrimination. In other words, defendants contend that Graham fails to satisfy the second and fourth prongs of the <u>McDonnell Douglas</u> analysis. Each argument is considered below.

i) <u>Satisfactory Job Performance as ARDC Security Captain</u>

As evidence that he was performing his Security Captain duties satisfactorily, Graham points to his long service with DOC and states that, up until DW Olivo's assignment as ARDC supervisor, he maintained an "excellent service record." (Graham Aff. ¶ 4.) Graham further states that he was awarded the prestigious Security Captain post because of this excellent record and his substantial seniority at DOC. (<u>Id.</u> ¶ 6.) In response, defendants cite the numerous instances of Graham's alleged poor performance discussed above. According to defendants, Graham demonstrated "many professional shortcomings and [a] lackadaisical attitude" which warranted his removal as Security Captain. (Defs.' Mem. at 2.) Graham argues that these allegations are subjective and vague. (<u>See</u> Pl.'s Mem. at 2.)

The Second Circuit has explained that "the qualification necessary to shift the burden to defendant for an explanation of the adverse action is minimal; [a] plaintiff must show only that he possesses the basic skills necessary for performance of [the] job." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92 (2d Cir. 2001) (citation omitted). In addition, where, as here, "the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." Id.; see also Cramer v. Pyzowski, CV-04-1122, 2007 WL 1541393, at *6 (E.D.N.Y. May 25, 2007) (requiring that plaintiff show only possession of basic skills comports with the de minimis prima facie burden). Moreover, where, as here, an employer has retained a plaintiff for a substantial period of time, the court may infer that such a plaintiff possesses at least the minimal skills necessary to perform the job for which he was hired. Arrocha v. City Univ. of N.Y., CV-02-1868, 2004 WL 594981, at *4 (E.D.N.Y. Feb. 9, 2004). Based on his long career with DOC and his apparently unblemished employment record prior to May 2004, which included approximately two years as Security Captain prior to the assignment of Warden Curcio and DW Olivo to ARDC, I conclude that Graham has sufficiently demonstrated that he possessed the minimal skills required for the Security Captain post.

ii)      Inference of Discrimination

Next, Graham must demonstrate that the circumstances surrounding defendants' actions give rise to an inference of discrimination. "One 'common and especially effective method' for [plaintiff] to discharge this burden is to show 'that the employer treated a similarly situated employee differently.'" McDonald v. Maimonides Medic. Cent., CV-99-6849, 2002 WL 257818, at *5 (E.D.N.Y. Jan. 3, 2002) citing McGuiness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). As discussed earlier, the crux of Graham's claim centers on the September 16, 2004 incident in which he was—but a Caucasian Captain was not—formally reprimanded for

breaching DOC security regulations when interviewing inmates at ARDC. (See Pl.'s Mem. at 15; Graham Dep. II at 43.)

At his deposition, Graham testified that his allegedly improper conduct—interviewing inmates who are dressed in civilian clothing and un-handcuffed—is routine procedure at ARDC and that doing so gains the trust and confidence of the inmates. (See Graham Dep. I at 53-58.) By contrast, DW Olivo testified that "it is common knowledge that you don't bring an inmate in civilian clothes uncuffed" to a security interview. (Olivo Dep. at 174.) DW Olivo further stated that "there [are] signs posted in the [office] stating that all inmates must be handcuffed" and that "there is a picture of handcuffs in the [office]." (Id.) DW Olivo maintained that this incident demonstrated that Graham was "lazy" and "unwilling" to perform his duties. (Id. at 183.) Warden Curcio also stated that it is "common sense that inmates should be handcuffed at all times when interacting with DOC personnel in the security or other office", but conceded that Graham did not violate any specific DOC rule or regulation. (Curcio Aff. ¶ 16.) As a result of this incident, DW Olivo levied three formal charges against Graham, citing his "egregious" failure to "supervise the work" of a different ARDC staff member who was purportedly responsible for escorting inmates to the interviews. (See Notice of Mot., Ex. V.) According to Graham, all of these charges were ultimately dismissed. (See Pl.'s 56.1 Stmt. II ¶ 54.) Defendants apparently concede this fact and note that the disciplinary charges were "administratively filed and not brought to trial." (See Defs.' Reply 56.1 Stmt. ¶ 54.)

As noted earlier, it is undisputed that Captain McGarrigle was also present during these inmate interviews, yet was not disciplined for the alleged infractions of security procedures. (Defs.' Reply 56.1 Stmt. at ¶ 49.) Defendants argue that Graham and Captain McGarrigle are not "similarly situated" DOC employees and, thus, Graham cannot demonstrate disparate

treatment establishing an inference of discrimination.  (See Defs.' Mem. at 17-18.)  However,

plaintiff need only show that a "sufficiently similar" employee was treated differently and that

there is but a "minimal inference" that the disparate treatment stemmed from racial animus.

McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001).

In this case, defendants argue that there are material differences between Graham's

Security Captain post and McGarrigle's Investigation Captain post.  (See Defs.' Mem. at 18.)  In

support, defendants submitted the official DOC position descriptions for each job title.  (See

Notice of Mot., Exs. G and T.)  However, these exhibits fail to materially distinguish the two

positions.  For example, the incident at issue here involved inmate interviews conducted in an

ARDC security office, yet neither position description expressly describes such duties.

Specifically, Security Captain duties include, in relevant part: supervision of all searches;

conduct investigations; and all other assignments as directed by the DW of Security.  (See id.,

Ex. G.)  Investigation Captain duties include, in relevant part: supervision of scheduled searches;

conduct investigations of unusual incidents and use of force incidents as directed by the Warden

or DW of Security; investigate and respond to inmate complaints and legal division requests

regarding legal claims; and initiate re-arrest processes.  (See id., Ex. T.)

However, it is undisputed that Captains Graham and McGarrigle shared the same rank,

worked at the same DOC facility and, on September 16, 2004, were both interviewing inmates in

the same security office at ARDC.  Considering the evidence in the light most favorable to

plaintiff, the Court finds that Graham has demonstrated that he and Captain McGarrigle were

sufficiently similar at the time of the incident at issue.  Moreover, the undisputed fact that

Captain Graham was, while Captain McGarrigle was not, disciplined for conduct that defendants

described as an egregious violation of security procedures is sufficient to establish a minimal

inference that this disparate treatment stemmed from racial animus.  Accordingly, I find that Graham has met his <u>de minimis</u> burden of establishing prima facie discrimination.

    iii)    <u>Legitimate, Non-discriminatory Reason and Pretext</u>

Because Graham has established a prima facie case of discrimination, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for their action.  <u>Byrnie v. Town of Cromwell, Bd. Of Educ.</u>, 243 F.3d 93, 102 (2d Cir. 2001).  The employer's proffered reason must be clear and specific in order to give the plaintiff a full and fair opportunity to demonstrate pretext.  <u>Meiri v. Dacon</u>, 759 F.2d 989, 996-97 (2d Cir. 1985).  To establish that defendants' proffered legitimate reason is pretextual, plaintiff "may demonstrate that discrimination was the real reason by showing that it was *a* motivating factor—although it need not be the *only* motivating factor."  <u>Tarshis v. Riese Org.</u>, 211 F.3d 30, 36 (2d Cir. 2000) (emphasis in original) (<u>abrogated on other grounds by</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002)).

Here, although Graham's allegedly unsatisfactory job performance, if accurate, would present a legitimate and non-discriminatory reason for removing him as Security Captain, Graham notes that defendants invoke the very incidents that he claims are evidence of discrimination as a legitimate basis for their actions.  At this stage, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred."  <u>James v. N.Y. Racing Ass'n.</u>, 233 F.3d 149, 156 (2d Cir.2000).  If the plaintiff presents a genuine issue of fact as to whether "the employer's proffered explanation is unworthy of credence," summary judgment must be denied.  <u>Jetter v. Knothe Corp.</u>, 324 F.3d 73, 77 (2d Cir.2003) (internal citation omitted).  As discussed earlier, viewing the entire record in the light most favorable to Graham, I find that there are genuine issues of disputed fact concerning Graham's performance as Security Captain and whether

defendants' complaints of poor job performance either provided a legitimate, non-discriminatory basis for his transfer or represented a pretext designed to mask impermissible discrimination.

In particular, the Court notes that, prior to the arrival of Warden Curcio and DW Olivo at ARDC in April and May of 2004, Graham had an unblemished employment record spanning a twelve-year period with DOC; yet, defendants submit that his competence and work-ethic deteriorated to an extreme extent over a brief period of time such that his removal as Security Captain approximately four months later was required.  (Compare Curcio Aff. ¶ 11 (describing Graham's job performance as "exemplary" in August 2004) with id. ¶ 17 (reporting "concerns with [Graham's] performance and attitude" in September 2004) and id. ¶ 30 (stating that Graham demonstrated a "lackadaisical attitude, and lack of initiative.")).  Additionally, it is undisputed that following Graham's reassignment, Captain Boyd was awarded Graham's former post, while Graham was subsequently transferred to Captain Boyd's former post as Food Service Captain.[4] (See Defs.' 56.1 Stmt. ¶ 6.)  Finally, as noted earlier, the formal disciplinary charges brought against Graham were ultimately dismissed. (See Pl.'s 56.1 Stmt. II ¶ 54; Defs.' Reply 56.1 Stmt. ¶ 54.)

In sum, a reasonable juror may credit the testimony of the ARDC supervisors and determine that Graham's work performance warranted his transfer and that defendants' decision was not motivated by racial animus.  On the other hand, a reasonable juror, should he or she credit Graham's testimony, may infer that his job performance was satisfactory, that his reassignment was unjustified, and that discriminatory animus motivated, at least in part, defendants' action.  See Williams v. City of N.Y., CV-99-2697, 2006 WL 2668211, at *13 (E.D.N.Y. Sept. 11, 2006) ("Since there are frequently questions of fact as to whether the reasons

---

[4] As discussed earlier, while defendants do not dispute that Captain Boyd was awarded the Security Captain post following Graham's removal, they claim that two out of the three applicants for the position were African-American Captains, but that both eventually declined the post.  (See Defs.' Reply 56.1 Stmt. ¶ 6.)

proffered by employers for actions taken against employees are credible or merely pretexts for discrimination, summary judgment is often inappropriate in employment discrimination cases.")

2. Retaliation

Retaliation claims are also analyzed using the familiar McDonnell Douglas burden-shifting framework. McDonnell Douglas, 411 U.S. at 792. In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate "evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected participation under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks omitted). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a request for summary judgment is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). If plaintiff satisfies his initial burden, the burden shifts to defendants to establish a legitimate, non-retaliatory basis for their action. If defendants do so, the burden returns to plaintiff, who must demonstrate that the legitimate, non-retaliatory reason articulated by defendants is a pretext, and that retaliation was more likely than not the reason for the complained-of action. Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).

"[T]he anti-retaliation provision [of Title VII], unlike [Title VII's] substantive provision, is not limited to discriminatory action that affects the terms and conditions of employment." Burlington Northern & Sante Fe Railway Co. v. White, 548 U.S. 53, 64 (2006); Kessler v.

Westchester Cty. Dept. of Soc. Servs., 461 F.3d 199, 207-08 (2d Cir. 2006). Rather, to prevail on a claim for retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68 (citations and quotation marks omitted).

Claiming actionable retaliation in this case, Graham asserts that he was removed from the Security Captain post immediately following his filing of discrimination charges with DOC's OEEO. (See Compl. ¶13; Pl.'s Mem. at 19-20.) Graham also states that his application for a post in the Learning Center was rejected in retaliation for his filing of these charges. (Pl.'s Mem. at 20.) Additionally, Graham contends that his applications for three other steady posts at ARDC were similarly rejected in retaliation for his various complaints of discrimination. (Graham Aff. ¶¶ 23-25.) Defendants move for summary judgment claiming that plaintiff has failed to establish the requisite causal connection between his formal reports of discrimination and the retaliatory conduct complained of. (Defs.' Mem. at 23-26.) Defendants also contend that plaintiff has failed to demonstrate that defendants' proffered non-retaliatory reasons for their actions were pretexts to mask unlawful discrimination. (Id. at 26.)[5]

a) Causation

Plaintiff can prove causation "either (1) indirectly, by showing that protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against plaintiff by the defendant." Gordon v. N.Y. City

---

[5] As with plaintiff's prima facie discrimination claim, plaintiff satisfies the first McDonnell Douglas prong with regard to his retaliation claim and defendants concede for purposes of this motion that plaintiff has established that he suffered an adverse employment action, and thus satisfies the third McDonnell Douglas prong with regard to his retaliation claim. (See Defs.' Reply Mem. at 8 n.4.)

Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citation omitted).  Here, Graham offers no direct evidence of retaliatory animus, but argues that the temporal relationship between his protected activity and various adverse employment actions suggests a causal connection.  In order to find that temporal proximity between an employer's knowledge of protected activity and an adverse employment action is sufficient evidence of causation, the temporal proximity must be "very close."  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

i)      OEEO Charge and Removal as Security Captain

Graham states that he filed charges of discrimination with the DOC OEEO on September 28, 2004 and that he was removed as ARDC Security Captain on October 6, 2004.  (Graham Aff. ¶¶ 17, 28.)  However, defendants argue that the decision to transfer Graham was made before Graham filed his OEEO charge.  (See Defs.' Mem. at 24-25.)  Specifically, defendants contend that the "command discipline" which led to Graham's eventual transfer preceded his OEEO complaint by eight days.  (See id. at 24.)  This position is bolstered by a DOC intradepartmental memorandum from DW Olivo to Warden Curcio, dated September 21, 2004, which summarized DW Olivo's complaints against Graham and stated that "it is imperative [that Graham] be moved to less confidential and significant duties for the good order of the institution."  (See Notice of Mot., Ex. I.)  According to defendants, this memorandum was converted into formal charges on September 27, 2004—one day before Graham's OEEO complaint.  (See Defs.' Mem. at 24.)  It appears from the record that Graham received the charges on October 5, 2004 and, in response, rejected them and requested a formal hearing, which was held the same day.  (See Notice of Mot., Ex. V; Pl.'s 56.1 Stmt. II ¶¶ 77-78.)  The next day, October 6, 2004, Graham was officially reassigned.  (Graham Aff. ¶ 17; Graham Dep. II at 29.)

In his memorandum in opposition, Graham ignores the documentary evidence discussed above and simply re-states that he was removed from his post immediately following his initial complaint of discrimination. (Pl.'s Mem. at 19-20.) Significantly, Graham himself conceded at his deposition that he considered his removal as Security Captain evidence of discrimination but that "it was not retaliation." (Graham Dep. II at 67.) Moreover, the record suggests that it is highly unlikely that DW Olivo or Warden Curcio knew that Graham had filed any complaints of discrimination when they decided to remove him as ARDC Security Captain. (See Graham Dep. II at 57.)

Considering the evidence discussed above, the Court concludes that defendants' decision to remove Graham as ARDC Security Captain clearly preceded the filing of Graham's OEEO complaint and, therefore, the actions taken by defendants could not have been perpetrated in retaliation for Graham's OEEO complaint. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (finding no evidence of retaliation where the alleged adverse employment action preceded the filing of plaintiff's EEOC complaint); see also Pinero v. Long Island Veterans State Home, 375 F.Supp.2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity."). Accordingly, plaintiff has failed to establish a causal connection between the filing of his OEEO complaint and his transfer from the Security Captain post.

ii)      OEEO Charge and Denial of Learning Center Post

Next, Graham contends that he was denied appointment as Learning Center Captain in retaliation for filing his OEEO charge. (Pl.'s Mem. at 20.) Specifically, Graham testified that he concluded he was being retaliated against in this instance because "[t]here was no reason, in [his] opinion, that [he] should have been denied the learning center." (Graham Dep. II at 67.) In

response, defendants argue that, as with the circumstances surrounding Graham's removal as Security Captain, this personnel decision preceded the filing of Graham's OEEO complaint and therefore cannot be evidence of retaliation. (Defs.' Mem. at 24.) In support, defendants cite a DOC intradepartmental memorandum dated September 15, 2004—approximately two weeks prior to Graham's OEEO complaint—from Warden Curcio to all DOC uniform personnel which announced that Correction Captain T. Robinson had been appointed Learning Center Captain. (See Notice of Motion, Ex. N.) The memorandum also outlined which specific individuals applied for the Learning Center post and indicated that, in addition to Graham, a total of five DOC Captains sought the position. (Id.) Defendants also note, and Graham conceded at his deposition, that Captain Robinson is, like Graham, an African-American. (See Defs.' 56.1 Stmt. ¶¶ 48-49; Graham Dep. II at 64.)

Nevertheless, Graham disputes the timing of Warden Curcio's decision and asserts that the Learning Center post was not assigned to Captain Robinson until October 14, 2004— approximately two weeks after Graham filed his OEEO complaint. (Graham 56.1 Stmt. ¶¶ 48-49.) However, Graham does not challenge the authenticity of Warden Curcio's September 15, 2004 memorandum, nor does he contend that this document was not disseminated to DOC staff; instead, he cites an ARDC "steady assignment roster" which bears Warden Curcio's signature and is dated October 14, 2004. (See Graham Aff., Ex. B.) Defendants persuasively explain that this document is the product of normal DOC procedures. (See Curcio Decl. ¶ 32.) Specifically, Warden Curcio stated that the decision to award Captain Robinson the Learning Center post occurred on September 15, 2004 and that the memorandum was published to DOC staff on that date as a method of expediting her assignment. (Id.) Warden Curcio further stated that the steady assignment roster was eventually submitted to his office for signature on October 14,

2004 and that Captain Robinson's appointment was bureaucratically approved the following day. (Id. ¶ 33.)  The Court concludes that Warden Curcio's September 15, 2004 memorandum—published to all uniformed DOC employees—establishes that Captain Robinson had been selected as Learning Center Captain approximately two weeks prior to the filing of Graham's OEEO complaint.  Accordingly, plaintiff has failed to establish a causal connection between the filing of his OEEO complaint and defendants' decision to appoint Captain Robinson as Learning Center Captain.

iii)   Instant Lawsuit and Denial of Other DOC Positions

Lastly, with regard to the selection of individuals other than Graham for various steady assignments within ARDC, defendants argue that these personnel decisions were made approximately one year after plaintiff filed his complaints with OEEO, EEOC and, most recently, in this matter.  (Defs.' Mem. at 25.)  The complaint in this case was filed on November 17, 2005.  (See Dkt. No. 1.)  Graham subsequently applied for, but was not appointed to, the following posts on the following dates: (1) Control Room Captain (September 1, 2006); (2) Personnel Captain (September 19, 2006); and (3) Administrative Services Captain (October 30, 2006).

The Court agrees that these appointments are simply too temporally remote from any of plaintiff's protected activities to establish a causal connection between these activities and the purportedly adverse employment actions.  Courts in this Circuit routinely find lengthy gaps such as those present in this case too attenuated to establish a causal connection.  See, e.g., Butler v. Raytel Med. Corp., CV-98-6446, 2004 WL 1961522, at *4 (E.D.N.Y. Aug. 24, 2004) (one year); Lambert v. N.Y. State Office of Mental Health, CV-97-1347, 2000 WL 574193, at *13 (E.D.N.Y. Apr. 24, 2000) (five months); Cobian v. N.Y. City, CV-99-10533, 2000 WL 1782744,

at *18 (S.D.N.Y. Dec. 6, 2000) (four months).  Therefore, I find that Graham has failed to establish a close causal connection between the filing of the instant lawsuit and the appointment of other individuals to the various ARDC posts described above.[6]

For the forgoing reasons, I conclude that Graham has not established causal connection between the time periods in which he was transferred from the Security Captain post and denied appointment as Learning Center Captain with his filing of discrimination charges with DOC OEEO.  I also conclude that Graham has failed to establish a close causal connection between the filing of the instant lawsuit and the appointment of other employees to the Control Room, Personnel and Administrative Services posts.  Accordingly, I recommend that defendants' motion for summary judgment be granted as to plaintiff's retaliation claims.

3.  Hostile Work Environment Claim

To the extent that Graham claims that he was subjected to either a discriminatory or retaliatory hostile work environment in violation of Title VII, he must establish that the workplace was permeated with "discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," as well as demonstrate a specific basis for imputing the conduct that creates such an environment to his employer.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).  Additionally, "plaintiff must demonstrate that the conduct occurred because of, not incidental to, the protected characteristic."  White v. N.Y. City Dep't of Educ., CV-05-2064, 2008 WL 4507614, at *5 (E.D.N.Y. Sept. 30, 2008) (citations omitted).  In determining whether conduct constitutes a hostile work environment, courts consider the frequency and severity of the discriminatory

---

[6] The Court also notes that plaintiff has failed to respond to defendants' causation and proximity arguments with respect to the Control Room Captain, Personnel Captain, and Administrative Services Captain posts.

conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with plaintiff's work performance.  See Harris, 510 U.S. at 23.

In this case, Graham cites "frivolous" assignments that were "foisted" upon him as examples of discriminatory harassment.  (See Compl. ¶¶ 7-14; Graham Aff. ¶¶ 10-16.)  Graham also states that, following his reassignment to Food Service Captain, other ARDC staff ridiculed him with regard to inmate complaints concerning a tartar sauce shortage at Friday meals.  (Graham Aff. ¶ 22.)  In response to this claim, Warden Curcio stated that the tartar sauce issue was significant because "any deviations from the menu promised to inmates can lead to an inmate disturbance."  (Curcio Decl. ¶ 27.)

Even considering this record in the light most favorable to plaintiff, the complaints discussed above fail to establish that Graham was subjected to an abusive work environment at ARDC.  Here, there are no allegations describing racial slurs, derogatory comments or severely offensive conduct of a kind typically found in cases where an employer created an objectively hostile work environment.  See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (holding that a work environment is considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it); Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004) ("incidents that are relatively minor and infrequent will not meet the standard for a discriminatory hostile work environment.").  Even if Graham can establish that his superiors and other ARDC employees were rude to him and treated him harshly or unfairly, such conduct is insufficient to create a hostile work environment.  See Brennan v. Metropolitan Opera Ass'n., 192 F.3d 310, 318-19 (2d Cir. 1999); Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999) ("Title VII is not a 'general civility code.'") quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 (1998).

D.  Municipal Liability Under § 1981

Graham seeks to hold the City of New York liable under 42 U.S.C. § 1981.  To sustain such municipal liability, a plaintiff must show that his civil rights were violated pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  To determine whether a municipality is liable under Monell:

> [I]t is necessary to conduct a separate inquiry into whether there exists a "policy" or "custom." The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (i.e., a formal act by the municipality's governing body), and (2) where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken.

Davis v. City of N.Y., 228 F.Supp.2d 327, 336-37 (S.D.N.Y.2002) (citing Monell, 436 U.S. at 690, and Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986)).  A "custom" is an act that may not have formal approval but is so widespread "as to have the force of law."  Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).  However, a supervising official "need not be a municipal policymaker for all purposes.  Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the [municipality's] business."  Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) (quotes and citations omitted).  "[W]here an official who has final authority commits a discrete act, that act can be considered 'policy' for the purposes of governmental liability."  Rumala v. N.Y. City Transit Auth., CV-02-3828, 2005 WL 2076596, at *9 (E.D.N.Y. Aug. 26, 2005) citing Krulik v. Bd. of Educ. of N.Y. City, 781 F.2d 15, 23 (2d Cir.1986).  Finally, it is for the court to decide whether an individual possessed final policymaking authority in a particular area.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989).

Graham has not shown formal DOC policy that would permit municipal liability because nothing in the record discusses an "officially promulgated" policy of discrimination at DOC. However, on the "custom" prong, DW Olivo testified that all ARDC Captains worked directly under his command and reported to him. (See Olivo Dep. at 44; see also id. at 95 ("Graham worked directly for me.")). Furthermore, Warden Curcio conceded in his declaration that "[a]s ARDC Warden, [he] had final say concerning any personnel decisions within [ARDC], including removing, reassigning, or transferring Captains, to different posts or tours. [He] also had the final say concerning the awarding [of] steady posts to members of the service assigned to ARDC." (Curcio Decl. ¶ 6.) For these reasons, I find that Warden Curcio and DW Olivo possessed final policymaking authority at ARDC and I recommend that summary judgment on plaintiff's § 1981 claim be denied.

III. CONCLUSION

For the forgoing reasons, I respectfully recommend that defendants' motion for summary judgment be granted as to plaintiff's retaliation, national origin and New York Civil Service Law claims, and otherwise denied. Any objections to this report and recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6.

SO ORDERED.

Dated: March 10, 2009
        Brooklyn, New York

_____/s/_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE