UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHERMAN GRAHAM,<br><br>                Plaintiff,<br><br>    -against-<br><br>CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF CORRECTIONS,<br><br>                Defendants. | Index No. 05 Civ. 5428(CBA)(JMA)<br><br>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT |

Plaintiff Sherman Graham respectfully submits this memorandum of law in opposition to defendants' motion for partial summary judgment.

**Preliminary Statement & Factual Background**

Further discovery of the relevant legal materials has confirmed the legal basis for Chief Curcio's sworn attestation that, as Warden, he had "final say" regarding plaintiff's removal from the Security Captain's post and all such related personnel matters within his facility. The Commissioner of the Department of Corrections ("DOC") has expressly delegated to Wardens authority over, among other things, "personnel management" within their facilities, "including employee disciplinary actions, overtime, hiring requests, transfers, and

dismissals."[1] Declaration of Ivan A. Mendez, Jr. dated May 29, 2009 ("Mendez Decl."), Exh. HH.

Chief Curcio testified that, based on his twenty-five (25) years of experience at the DOC as a Warden, and more recently, as Chief of Administration and Chief of Facility Operations (two of the highest ranking positions within the DOC) he understood that the Rules and Regulations promulgated by the Commissioner vest "final say" regarding all such intra-facility personnel matters in the facilities' Warden. Transcript of the Deposition of Chief Curcio dated May 14, 2009 ("Curcio Tr.") at 18-20 (A copy of the entire Curcio Transcript is annexed to the Stoecker Declaration dated June 12, 2009 ("Stoecker Decl.") as Exhibit A); Declaration of Chief Peter Curcio sworn to on June 13, 2008 ("Curcio Decl.") at ¶ 6. See also Curcio Tr. at 8-9 (enumerating executive positions held during course of 25 year DOC career); 16-17 (Commissioner promulgates Rules and Regulations under authority delegated to him by New York City law); and 17-18 (Rules and Regulations reflect Commissioner's delegation of authority to Wardens).

Defendants' contention that Wardens "do not have the authority to promulgate or draft personnel or employment policies concerning DOC personnel" generally is irrelevant.

---

[1] Pursuant to Section 621 of the New York City Charter, the Commissioner of the Department of Corrections is the "head" or Chief Executive Officer of the Department.

Plaintiff does not content that DOC Wardens have authority to promulgate personnel policies for *all* DOC employees, both within and without their facilities. Compare Curcio Decl. ¶ 6 and Curcio Tr. at 18-20 with Curcio Dep. at 23 (noting only that DOC Wardens do not promulgate policies for all DOC employees, both within and without their facilities, when answering the following leading question in the negative: "do you have the authority to promulgate or draft employment policies concerning the employment of employees within *the department*")(emphasis added).[2]

      Rather plaintiff contends that the policies that the DOC Commissioner has drafted and promulgated, delegate final authority of over certain matters, including the intra-facility transfer at issue here, to facility Wardens. Curcio Tr. at 14 (discussing distinction between intra-facility transfers as to which Chief Curcio confirmed Wardens have "final say" and inter-facility transfers as to which they do not).

      Plaintiff Graham's removal from the Security Captain's post was effected by then Warden Curcio pursuant to the "final say" delegated to him over personnel matters by the Commissioner of the Department of Corrections *not* pursuant to any

---

[2] Plaintiff's counsel objected to the relevant question commencing at line 9 of page 23 of the Curcio Transcript because the phrase "within the department" was vague and ambiguous. In subsequent clarifying questions, it was confirmed that the question addressed "correction officers" generally, not just those within an individual Warden's facility.

disciplinary procedure. The authority to transfer plaintiff out of the Security Captain post *did not* emanate from DOC Directive # 4257, as defendants contend, because plaintiff's transfer was not effected pursuant to the Command Discipline procedure. Plaintiff declined to accept the September 27, 2004 Command Discipline - the only Command Discipline he was issue in the relevant time frame.[3] Declaration of Ivan A. Mendez, Jr. dated September 10, 2007, ("2007 Mendez Decl.") Exh. V. As a result of this declination, formal disciplinary proceedings were commenced against plaintiff pursuant to Section VI(E) of Directive # 4257. Those proceedings, and the propriety of *any* penalty or disciplinary action, were not resolved until long after plaintiff Graham's removal from the Security Captain post and further proceedings before the Office of Administrative Trials and Hearings (O.A.T.H.) as set forth in Directive # 7502. September 10, 2007 Mendez Decl., Exh. X (setting forth lengthy disciplinary process following the declination of a proposed Command Discipline).

---

[3] The September 27, 2004 Command Discipline (2007 Mendez Decl. Exh. V.) did not specify the penalty of removal from the Security Captain's post. Rather, then Warden Curcio imposed that consequence of his own accord pursuant to the power delegated to him by the DOC Commissioner after plaintiff declined to accept the Command Discipline and thereby initiated formal disciplinary proceedings which were not resolved until much later. September 10, 2007 Mendez Decl. Exh.D ("On October 6, 2004 as a result of not accepting the penalty imposed, (i.e., the Command Discipline) I was removed from my post Security Captain and placed on rotation.")

4

## ARGUMENT

### WARDEN CURCIO HAD "FINAL AUTHORITY" WITH REGARD TO PLAINTIFF GRAHAM'S REASSIGNMENT AND WAS THUS A POLICY-MAKER FOR MONELL PURPOSES

Defendants concede, as they must, that Monell's criteria are met where "a single act is taken by a municipal employee, who, as a matter of state law, has final policymaking authority in the area in which the action was taken." Defts'. Brief at 8 citing Davis v. City of New York, 228 F. Supp.2d 327 (S.D.N.Y. 2002), aff'd, 75 Fed. Appx. 827 (2d Cir. 2003).  As the Supreme Court explained in Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986): "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decision-makers, it surely represents an act of official government 'policy' as that term is commonly understood." Id.

Defendants reliance on Soto v. Schembri, 960 F. Supp. 751 (S.D.N.Y. 1997), for the proposition that final authority with respect to personnel decisions for all New York City employees is vested with the "Personnel Director" is misplaced. In Soto, the Court cited New York City Charter Sections 814(d) and 817.  Neither of the foregoing sections of the current New York City Charter, however, support that proposition in this

5

case. Section 814(d) has no bearing on this issue. Section 814(c) which is presumably the section Judge Cote relied upon, provides that "the commissioner [of citywide administrative services] shall promulgate rules and regulations relating to the personnel policies, programs and activities of city government *in furtherance of and consistent with the state civil service law and this chapter*." (emphasis added). Thus the Commissioner of City-wide Administrative Services' authority is limited to the promulgation of policies "in furtherance of" the Civil Service Law, i.e., regulations which implement the provisions of that law.

As discussed further below, the Civil Service Law and regulations do not address *reassignments* and contain no constraint on that traditional, day-to-day management prerogative. Plaintiff Graham's lateral reassignment therefore did not implicate the Civil Service Law.

Section 817 of the New York City Charter, upon which Judge Cote and defendants further rely, is also not relevant here. It provides that: "[a]ll *appointments, promotions and changes in status* of persons in the public service of the city shall be made in the manner prescribed by the constitution of the state and *in accordance with the provisions of the civil service law* and other provisions of law not inconsistent therewith nor with this charter." (emphasis added). Plaintiff

6

Graham's reassignment, although an adverse employment action, was not "an appointment" "promotion" or "change in status" within the meaning of the Civil Service Law and Regulations. Rather is was merely a reassignment to a different section of then Warden Curcio's facility.[4]

The Civil Service Law regulations specifically distinguish between "transfers" which are subject to Civil Service Law constraints, and "reassignments", which are not. Compare 4 NYCRR § 1.2(b)(1)(defining "transfer") with § 1.2(b)(2)(defining "reassignment"). Section 5.1 of the Civil Service regulations (4 NYCRR § 5.1) contain various constraints on "transfer." There are no constraints, however, on "reassignments" anywhere in the Civil Service Law or regulations that our research has revealed.

Plaintiff Graham's removal from the Security Captain's post was a "reassignment" inasmuch as it was merely a "change, without further examination, of a permanent employee from one position to a position in the same title under the jurisdiction of the same appointing authority." 4 NYCRR § 1.2(b)(2). Plaintiff Graham retained his rank and title of Captain and

---

[4] The term "appointment" also has a specific meaning and entails detailed procedures as set forth in Section 4.2 of the Civil Service Law regulations. Plaintiff Graham was not "appoint[ed]" to a new post upon his removal from the Security Captain position nor did his "status" change in any way that implicates the Civil Service Law – he was neither promoted nor demoted – notwithstanding that he was reassigned to a position which, as a practical matter, was less desirable.

7

remained under the jurisdiction of the same "appointing authority."

Section 815 of the New York City Charter, moreover, expressly vests power regarding virtually all routine personnel matters in the "heads" of the various departments and also contains a "catch-all" provision giving department "heads" the power to "perform such other personnel management functions . . . that are not otherwise assigned by this chapter." No where does the applicable Chapter or the remainder of the City Charter vest in the Commissioner of Citywide Administrative Services or any "Personnel Director," authority over intra-departmental "reassignments", either generally or in the Department of Corrections. See also New York City Charter Sections 385(b)("all functions, powers and duties assigned to each mayoral agency by the charter or other law shall be vested in the head of such agency") and Section 1150 (defining term "agency" to include "department").

Section #3 of the DOC official Command Discipline Form #454 also recognizes that the Civil Service Law "does not preclude the exercise of management [] prerogatives such as transfer, reassignment, etc." 2007 Mendez Decl. Exh. V.

In sum, the Charter provisions on which defendants rely vest only city-wide Civil Service Law matters in the Commissioner of Citywide Administrative Services and leave

8

routine intra-department personnel matters to the "heads" of the various departments. Plaintiff Graham's reassignment did not implicate the Civil Service Law and was therefore wholly within the province of the DOC Commissioner and his delegatee Warden Curcio.

## Conclusion

For all of the foregoing reasons plaintiff respectfully requests that defendants' motion for partial summary judgment be denied.

Dated: Mineola, New York
       June 12, 2009

>                     Law Offices of Karl J. Stoecker
>                     22 Jericho Turnpike, Suite 100 East
>                     Mineola, New York 11501
>                     (212) 818-0080
>                     kjs@kjslawfirm.com
>
>
>                     _____/s_____
>                     Karl J. Stoecker (KS 0571)