UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHERMAN GRAHAM,

                    Plaintiff,

               -against-

CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CORRECTIONS,

                    Defendants.

Index No. 05 Civ.
5428(CBA)(JMA)

STOECKER DECLARATION

        Karl J. Stoecker declares pursuant to 28 U.S.C. § 1746
as follows:

        1.   Exhibit A hereto is an true and correct copy of
the transcript of the deposition of Chief Peter Curcio taken on
May 14, 2009.

        I declare, under penalty of perjury, that the
foregoing is true and correct.

Dated:  Mineola, New York
        June 12, 2009


                         Law Offices of Karl J. Stoecker
                         22 Jericho Turnpike, Suite 100 East
                         Mineola, New York 11501
                         (212) 818-0080
                         kjs@kjslawfirm.com


                         _____/s_____
                         Karl J. Stoecker (KS 0571)

**EXHIBIT A**

```
 1                                              1

 2

 3   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 4   ------------------------------------X

 5   SHERMAN GRAHAM,

 6                    Plaintiff,

 7              - against -

 8   CITY OF NEW YORK, NEW YORK CITY
     DEPARTMENT OF CORRECTIONS,
 9
                     Defendants.
10   ------------------------------------X

11

12                    22 Jericho Turnpike
                      Mineola, New York
13                    May 14, 2009
                      12:05 P.M.
14

15

16           EXAMINATION BEFORE TRIAL of PETER

17   CURCIO, a witness on behalf of the Defendants

18   herein, taken by the attorneys for the respective

19   parties,  pursuant to Notice, and held before

20   Sharon Cassidy, a Notary Public of the State of

21   New York at the above-stated time and place.

22                    *    *    *    *

23

24                                        COPY

25
```

```
 1                                              2

 2

 3    APPEARANCES:

 4

 5        KARL J. STOECKER, ESQ.
               Attorney for the Plaintiff
 6             22 Jericho Turnpike, Suite 100 East
               Mineola, New York 11501
 7

 8

 9    NEW YORK CITY LAW DEPARTMENT
      OFFICE OF THE CORPORATION COUNSEL
10             Attorneys for the Defendants
               100 Church Street
11             New York, New York 10007

12        BY:  IVAN A. MENDEZ, JR., ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their respective Counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

1

2 P E T E R    C U R C I O,

3     The witness herein, having first been duly

4 sworn by Sharon Cassidy, a Notary Public in and

5 for the State of New York, was examined and

6 testified as follows:

7 DIRECT EXAMINATION BY KARL J. STOECKER, ESQ.:

8     Q     Please state your name for the record.

9     A     Peter Curcio.

10     Q     What is your business address?

11     A     1313 Hazen Street, East Elmhurst, New

12 York 11378.

13     Q     Chief Curcio, I am Karl Stocker.  I

14 represent the plaintiff Sherman Graham in this

15 case.  I am here to ask you a series of questions

16 about your duties and responsibilities at the

17 Department of Corrections and in particular a

18 number of events that occurred with respect to

19 Sherman Graham, the plaintiff in this case.

20         Have you been deposed before?

21     A     Yes.

22     Q     On how many occasions?

23     A     Three to four.

24     Q     Were they work-related matters?

25     A     Yes.

2     Q     What types of matters were they?

3     A     The latest was in a labor litigation

4  with the Captain's Association against the agency,

5  against shift reductions.  The one previous to

6  that was a female class action, plaintiffs against

7  the agency at large.

8     Q     What was the nature of the class

9  action?

10    A     That females were being discriminated

11  against.

12    Q     All females within the department?

13    A     The plaintiffs were suggesting that,

14  yes.

15    Q     And you were deposed in that case?

16    A     Yes.

17    Q     When did that occur?

18    A     Within the last quarter.

19    Q     The last three months?

20    A     Three to four months ago.

21    Q     And the other time you were deposed?

22    A     Probably within the last six months,

23  five to six months ago.

24    Q     What was that about?

25    A     Shift reductions for captains.

```
 1
 2      Q       Was the last deposition in the context
 3   of a grievance filed by the union?
 4      A       The latter one was with the shift
 5   reductions.  The first one was, to my
 6   understanding, a class action suit by the
 7   plaintiffs.
 8      Q       The first one was --
 9      A       The lawsuit by the females against the
10   agency.  It was a class action lawsuit.  The
11   latter one was with the shift reductions based on
12   a grievance.
13      Q       You said there were three, correct?
14      A       Yes.
15      Q       The first one was with respect to shift
16   reduction.  You mentioned that was a grievance as
17   well?
18      A       The most recent one was grievance
19   related.  The one prior to that was the class
20   action.
21      Q       And the one before that?
22      A       Possibly related to this case.
23      Q       Related to this case?
24      A       Or something to do with my tenure at
25   ARDC.
```

1

2     Q     What was the issue with respect to your

3 tenure at ARDC in that case?

4     A     Officer Monche filed a complaint that

5 mentioned Captain Graham as well.

6     Q     Officer Monche?

7     A     M-O-N-C-H-E.

8         MR. MENDEZ: Off the record, please.

9         (Whereupon, there was a discussion

10      held off the record.)

11     Q     With respect to this matter relating to

12 Officer Monche's complaint, what exactly did you

13 do in that?

14     A     They asked about my duties and

15 responsibilities.

16     Q     Who was it that asked you?

17     A     I don't have counsel's name. It was

18 somewhere in midtown Manhattan.

19     Q     Was there a court reporter there who

20 was transcribing the conversation?

21     A     Yes.

22     Q     That case concerned a complaint by

23 Officer Monche?

24     A     Yes.

25     Q     And the plaintiff Sherman Graham was

1
2   mentioned in that complaint?

3       A    Peripherally, I believe so, yes.

4       Q    So you've been through this a number of

5   times.  I take it you're familiar with the ground

6   rules?

7       A    Yes.

8       Q    That all your responses are under oath,

9   therefore, it's very important you understand the

10  question before you respond.  If you don't

11  understand it, you can let me know and I will

12  rephrase it.

13      A    Yes.

14      Q    Why don't you just briefly summarize

15  very quickly your history of employment at the

16  DOC, what positions you've held there?

17      A    Okay.  I started with the agency in

18  1984.  I got promoted to captain in 1989.  I got

19  promoted to assistant deputy warden in 1996.  I

20  got promoted to deputy warden around 1998.  I got

21  promoted to deputy warden in command around 2000.

22  I got promoted to warden in or around 2002.  I was

23  assigned to assistant chief in 2006 and borough

24  chief in 2007.

25      Q    When you say borough chief, was that

2    chief of a particular borough?

3         A    Initially, I was chief of

4    administration.  Since December of 2008, I have

5    been chief of facility operations.

6         Q    When you were the assistant chief, what

7    division was that?

8         A    Assistant chief of administration.

9         Q    What were your duties and

10   responsibilities as the assistant chief of

11   administration?

12        A    To oversee the agency's correction

13   academy, firearms and tactic's unit, officer's

14   response unit and CARE.  I was in charge of health

15   management, the overtime control unit and in

16   charge of the uniform resource allocation.

17        Q    What does that mean?

18        A    That office administers transfers and

19   moves between the various facilities.

20        Q    What did you do in that capacity?

21        A    I oversaw the unit, the uniform

22   resource allocation command.

23        Q    What did you actually do?  When you say

24   you oversaw the unit, what did that entail?

25        A    Assignment of probationary officers to

2    the facilities, spec up transfers for final

3    approval by the chief of the department.

4         Q    Now, the first one you stated was the

5    assignment of probationary officers.

6         A    When they graduate from the academy,

7    where they will be deployed.

8         Q    So that was the first thing.

9         A    That was one of the duties.

10        Q    What did you do in that regard?

11        A    The office would do a ratio of where

12   different employees should go.  In that regard, I

13   would oversee, I would make adjustments where I

14   saw fit and execute the deployment.

15        Q    The second thing you mentioned was the

16   specific up transfer.

17        A    Members put in transfer requests and

18   they're accommodated based on the needs of the

19   agency, tenure, performance, seniority, etcetera.

20   The office would then review the transfer request

21   based on needs of the facilities, who needs to go

22   where, and I would review that and prepare it for

23   final authority by the chief of the department.

24        Q    So you reviewed every transfer request

25   made by every employee or a certain subset of

1

2    employees or what?

3        A    Those that were screened and vetted and

4    were needed in the facility.

5        Q    I'm not sure what you mean by screened

6    and vetted.  How would that process work?

7        A    For example, a desirable place to go

8    are the hospitals.  A thousand employees could put

9    in transfers to the hospitals, but if there are

10   only three positions needed or three vacancies, I

11   wouldn't see the nine hundred and ninety-nine

12   transfers.  They would review them, pick the

13   earliest one, look at seniority, attendance and

14   execute the movement, like the ones that have

15   already been vetted, review it and make sure they

16   meet the criteria and send it on to the chief of

17   department for final review.

18       Q    So this was the process that you're

19   talking about now, the so-called spec up

20   transfers, that was an instance in which a member

21   of service himself put in a request for a

22   transfer?

23       A    Self solicited, yes.

24       Q    Other than the probationary officers,

25   that is those leaving the academy, and the self

1
2  solicited?

3      A    Self solicited.

4      Q    Did you do anything else with respect

5  to the resource allocation?

6      A    Disciplinary transfers, any movement of

7  staff.

8      Q    When you say any movement of staff?

9      A    Request by the inspector general,

10  request by --

11     Q    I just want be clear.  You're

12  mentioning specific circumstances in which you

13  could possibly get involved.  But you don't review

14  every transfer that occurs at the Department of

15  Corrections?

16     A    I do not review every transfer request.

17  In that position I reviewed every transfer that

18  was executed.  As I stated, many members can

19  request a transfer.  The ones that were executed,

20  once it was validated, it would go on the agency

21  teletype and I would review that teletype before

22  it was promulgated.

23     Q    What you're talking about is with

24  respect to self solicited?

25     A    That is one component.  Any transfer,

2    self solicited or initiated, by one of the other

3    persons that I mentioned, inspector general, the

4    investigation division.

5        Q      For example, if an assistant deputy

6    warden decides to move one of his captains from,

7    let's say, the control room to the being where

8    they're in confinement for twenty-three hours a

9    day -- what is that called again?

10       A      CPSU.

11       Q      If an assistant warden wants to move

12   one of his captains from the control room to the

13   CPSU or something like that, you would review

14   something like that?

15       A      I need to understand the question

16   because I think you may be --

17              MR. MENDEZ:  Are you asking one

18       facility --

19       A      Within one facility?

20              MR. MENDEZ:  -- or from one facility --

21       Q      Within one facility?

22       A      Within one facility, that's under the

23   direction of the warden.

24       Q      You have nothing to do with that?

25       A      In my position as chief administration,

1
2    no.
3        Q    So what's the distinction if a move is
4    within a facility or if it's from facility to
5    facility?
6        A    From facility to facility, chief
7    administration, I would get involved.  The warden
8    of the facility has overall supervision of the
9    facility.  He would get involved with placements
10   in his facility.
11       Q    So you would have final authority if
12   someone is moving from facility to facility and if
13   someone is moving from one position within a
14   facility to another position within that same
15   facility, the warden would have final authority?
16            MR. MENDEZ:  Objection to form.  You
17       can answer.
18       A    Yes.  Just to clarify the first part,
19   you said as chief of administration.  I wasn't the
20   final authority.  I would work up a draft that
21   would need final approval by the chief of the
22   department.  I would work up that draft on the
23   chief's behalf, Chief Carolyn Thomas, in reference
24   to a facility.
25       Q    So for an interfacility transfer, the

```
 1                    Peter Curcio                    15

 2   warden would have final authority?

 3        A    Yes.

 4             MR. STOCKER:  I would like to mark this

 5        as Plaintiff's Monell Exhibit 1.

 6             (Whereupon, a two-page document was

 7        marked as Plaintiff's Monell Exhibit 1 for

 8        identification, as of this date.)

 9        Q    Plaintiff's Monell Exhibit 1 is a

10   two-page document.  At the bottom it says, Warden

11   001 and the next page says, Warden 002.

12   Apparently this is an excerpt from another

13   document which was produced to us by your counsel,

14   Mr. Mendez.  Are you familiar with this document?

15        A    Yes.  It looks like the duties of a

16   warden.

17        Q    Can you describe where this comes from?

18        A    No.

19        Q    You don't know if this comes out of

20   some manual or directive?

21        A    No, but this replicates the rules and

22   regulations.

23        Q    Do those rules and regulations have a

24   more formal name?

25        A    Rules and regulations.
```

1

2      Q     Is it called the official rules and

3  regulations of the New York City Department of

4  Corrections or something like that?

5      A     Yes.  It's just called the rules and

6  regulations.

7      Q     So this is an excerpt from the rules

8  and regulations?

9      A     I am not sure if it's an except, but

10  it's a summary of the duties of a warden covered

11  in the rules and regs.

12      Q     So this reflects what is in the rules

13  and regulations, as far as you're aware?

14      A     Yes.

15      Q     What's your understanding of what the

16  rules and regulations are and where do they come

17  from and what is their purpose?

18      A     They come from the rules and regs and

19  they govern the authority of a warden.

20      Q     Who promulgates the rules and regs?

21      A     The commissioner of the agency.

22      Q     The commissioner of the Department of

23  Corrections?

24      A     Yes.

25      Q     He promulgates the rules and regs under

1
2    the authority delegated to him by the New York

3    City Law, is that your understanding?

4        A    Yes.

5        Q    So he is given the authority to do

6    various things by the commissioner?

7            MR. MENDEZ:  Note my objection.  Go

8        ahead.

9        Q    Is that correct?

10       A    Yes.

11       Q    And your understanding is that this

12   reflects his delegation of that authority to the

13   wardens?

14           MR. MENDEZ:  Note my objection.  Go

15       ahead.

16       A    His authority is governed by the rules

17   and regs and the direction that he assigns to the

18   wardens.

19       Q    Your understanding is that the

20   commissioner of the Department of Corrections is

21   given certain authority of the Department of

22   Corrections and then he delegates that authority

23   to wardens; is that correct?

24       A    Yes.

25       Q    And the exhibit you have before you,

2  Plaintiff's Monell Exhibit 1, reflects the

3  authority he delegates to the wardens?

4      A    Yes.

5      Q    This exhibit, does it accurately

6  reflect the authority that you understood was

7  delegated to you during the time that you were a

8  warden?

9          MR. MENDEZ:  Just read it closely.

10     A    Yes.

11         MR. STOCKER:  Please mark this as

12     Plaintiff's Monell Exhibit 2.

13         (Whereupon, Declaration of Chief Peter

14     Curcio was marked as Plaintiff's Monell

15     Exhibit 2 for identification, as of this

16     date.)

17     Q    Please take a look at Plaintiff's

18  Monell Exhibit 2.

19     A    Okay.

20     Q    I take it you've seen Exhibit 2 before?

21     A    Yes.

22     Q    That's your declaration; is that

23  correct?

24     A    Correct.

25     Q    How was this document prepared?

1

2      MR. MENDEZ:  I am going to object on

3      the grounds of attorney/client privilege.

4      Q     Did you prepare the document?

5      MR. MENDEZ:  Go ahead.

6      A     I was involved in the preparation of

7   the document, yes.

8      Q     What was the extent of that

9   involvement?

10      MR. MENDEZ:  Let's go off the record,

11      please.

12      (Whereupon, there was a discussion

13      held off the record.)

14      A     Counsel and I discussed the case and

15   the particulars.  I gave him information to

16   general questions.  He prepared the declaration on

17   my behalf.  I reviewed it, I attested it was

18   accurate and I signed it.

19      Q     When you attested it was accurate, you

20   understood that the statements made in this

21   declaration were sworn statements under penalty of

22   perjury?

23      A     Yes, and true to my belief and

24   knowledge.

25      Q     So every statement that you made in

1

2    this document is true?

3        A    To my belief and knowledge, yes.

4        Q    If you look at page two, paragraph

5    five, the second half of the page, do you see

6    that?

7        A    Yes.

8        Q    Does that accurately state your duties

9    as warden of ARDC?

10       A    Yes.

11       Q    And that's consistent with Exhibit 1,

12   the excerpt from the rules and regulations?

13       A    In summary, yes.

14       Q    Is the same true with respect to

15   paragraph six?  Does that paragraph accurately

16   reflect your responsibilities when you were a

17   warden of ARDC?

18       A    Yes, it does.

19       Q    And that, again, is consistent with the

20   rules and regulations?

21       A    In summary, yes.

22       Q    When you say summary, what do you mean?

23       A    Obviously the context isn't two pages

24   long like the attachment.  This summarizes that I

25   had final say of all the decisions in the

2  facility.

3      Q    In Plaintiff's Monell Exhibit 1?

4      A    Yes.

5          MR. STOCKER:  Please mark this as

6      Plaintiff's Monell Exhibit 3.

7          (Whereupon, a one-page document was

8      marked as Plaintiff's Monell Exhibit 3 for

9      identification, as of this date.)

10     Q    I am going to show you what's been

11 marked as Plaintiff's Monell Exhibit 3.  Have you

12 seen this document before?

13     A    I don't have a recollection, but

14 likely, yes.

15     Q    Is this a document prepared by you?

16     A    Somebody signed it on my behalf.

17     Q    Who would have signed it?

18     A    It could have been one of the deputy

19 wardens.

20     Q    Could you explain what that means,

21 somebody signed it on your behalf?

22     A    If I'm out for the day or out for the

23 week, my authority is relegated to somebody else

24 whose position is in charge.

25     Q    But it's from you, not from that

1

2    person?

3        A      They signed it on my behalf.

4        Q      That reflects it's your authority that

5    is being implemented here?

6        A      Yes.

7        Q      What is the purpose of this document?

8               MR. MENDEZ:  Let's go off the record,

9        please.

10              (Whereupon, there was a discussion

11       held off the record.)

12       Q      What is being done within this

13   document?

14       A      It appears that the school post which

15   we're referring to, the learning center captain,

16   is temporarily being assigned to Captain T.

17   Robinson.

18       Q      Why is it you're announcing that?

19       A      To advise the command that this is the

20   decision that was made.

21       Q      And this was your decision?

22       A      Yes.

23              MR. STOCKER:  I have no further

24       questions.

25              MR. MENDEZ:  I am going to ask him a

```
 1
 2        couple of follow-up questions.
 3   DIRECT EXAMINATION BY IVAN A. MENDEZ, JR. ESQ.:
 4        Q      Good afternoon, Chief.  I just want to
 5   ask you some follow-up questions related to your
 6   authority as warden at ARDC, during your tenure
 7   there.
 8        A      Okay.
 9        Q      As warden at ARDC or any other
10   correctional facility, do you have the authority
11   to promulgate or draft employment policies
12   concerning the employment of employees within the
13   department?
14             MR. STOCKER:  Object to the form.  It's
15             vague and ambiguous.
16        A      No.
17        Q      For example, do you have the authority
18   to make up what constitutes a terminable offense
19   for a correctional officer?
20        A      No.
21        Q      Do you have the authority to dictate
22   how many sick days a corrections officer can take?
23        A      No.
24        Q      Do you have the authority to dictate
25   what type of uniform a corrections officer has to
```

```
1                      Peter Curcio                    24
2    wear?
3         A    No.
4         Q    Do you have the authority as warden of
5    a facility to fire on your order a tenured
6    corrections officer?
7         A    No.
8         Q    Or a captain?
9              MR. STOCKER:  You're going too fast.  I
10        object to the form of the question about this
11        notion of tenured corrections officer.
12        Q    A nonprobationary corrections officer,
13   can you terminate a nonprobationary corrections
14   officer?
15             MR. STOCKER:  I object to the form.
16        A    No.
17        Q    What's your understanding of what
18   tenured means, Chief?
19        A    Somebody that is not on probationary
20   period.
21        Q    Is it your understanding that somebody
22   who is no longer probationary has certain due
23   process rights that they're entitled to?
24        A    Yes.
25        Q    Do you have the authority as warden of
```

1

2  a facility to terminate a corrections captain who

3  is no longer probationary?

4      A     No.  A warden cannot even terminate a

5  probationary captain.

6      Q     Chief, I want to direct you to

7  Plaintiff's Monell Exhibit 2 which is your

8  declaration.  I want to direct your attention to

9  paragraph six where it indicates quote, as ARDC

10  warden, I have final say concerning any special

11  decisions within my facility, including removing,

12  reassigning or transferring captains to different

13  posts or towers.  I think you already just

14  testified to this, but does that authority entail

15  terminating employees?

16          MR. STOCKER:  I object to the form of

17          the question, to the use of the word

18          terminating.

19      A     No.

20      Q     Or firing?

21      A     No.

22      Q     Are these decisions which you describe

23  in paragraph six, such as reassigning or

24  transferring captains to different posts, are

25  those decisions you make as a warden pursuant to

1
2    your own rules and regulations?

3        A    No.

4        Q    Whose rules and regulations are you

5    following when you take such actions?

6        A    The rules and regs and parameters for

7    wardens as issued by the chief executive

8    commissioner.

9            MR. MENDEZ:  I have no further

10           questions.  Thank you.

11           (Whereupon, the examination of this

12           witness was concluded at 12:40 P.M.)

13                *      *      *      *

14           I have read the foregoing record of my

15   testimony taken at the time and place noted in the

16   heading hereof and I do hereby acknowledge it to

17   be a true and correct transcript of same.

18                        _____

19                              PETER CURCIO

20   Subscribed and sworn to

21   before me this _____ day

22   of _____, 2009.

23

24   _____

25       NOTARY PUBLIC

```
 1                                                    27

 2                        I N D E X

 3

 4    EXAMINATION OF              BY              PAGE

 5    Peter Curcio            Mr. Stocker        4-23

 6                            Mr. Mendez         23-26

 7

 8                        E X H I B I T S

 9    PLAINTIFF'S MONELL    DESCRIPTION          PAGE

10    1                     Two-page document      15

11    2                     Declaration of Chief

12                          Peter Curcio           18

13    3                     One-page document      21

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                              28
 2                C E R T I F I C A T I O N
 3
 4          I, Sharon Cassidy, a Notary Public of
 5     the State of New York do hereby certify:
 6          That the testimony in the within
 7     proceeding was held before me at the aforesaid
 8     time and place.  That said witness was duly sworn
 9     before the commencement of the testimony, and that
10     the testimony was taken stenographically by me,
11     then transcribed under my supervision, and that
12     the within transcript is a true record of the
13     testimony of said witness.
14          I further certify that I am not related
15     to any of the parties to this action by blood or
16     marriage, that I am not interested directly or
17     indirectly in the matter in controversy, nor am I
18     in the employ of any of the counsel.
19          IN WITNESS WHEREOF, I have hereunto set
20     my hand this 18th day of May,  2009.
21
22
23             _Sharon A. Cassidy_____
24                  SHARON CASSIDY
25
```